IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF KENTUCKY
SOUTHERN DIVISION AT LONDON

| | |
|---|---|
| TRINITY COAL CORPORATION and TRINITY COAL MARKETING, LLC, | ) ) ) |
| Plaintiffs, | ) ) ) |
| v. | ) ) ) Case No. _____ |
| SOUTH CAROLINA PUBLIC SERVICE AUTHORITY d/b/a SANTEE COOPER, | ) ) ) |
| Defendant. | ) ) ) |

## COMPLAINT

Plaintiffs, Trinity Coal Corporation ("Trinity Coal") and Trinity Coal Marketing, LLC ("Trinity Coal Marketing") (collectively, "Trinity"), through their undersigned counsel, state as follows for their Complaint against Defendant South Carolina Public Service Authority d/b/a Santee Cooper ("Defendant").

### I.  INTRODUCTION

1.  Trinity Coal and Trinity Coal Marketing are in the business of producing and selling coal. Trinity Coal owns and operates coal mines located in Perry, Breathitt, Knott, Magoffin, Floyd and Pike Counties in Kentucky, among other places. Trinity Coal Marketing has historically been responsible for selling the coal produced at Trinity Coal's mines, although Trinity Coal presently sells the majority of its own coal.

2.  One of Trinity Coal's coal mines is located in Perry County, Kentucky ("the Mine"). Until Defendant's material breach of its contract with Trinity Coal Marketing in early March 2012, the Mine, which opened in April 2005, employed more than 300 individuals, and was the among the larger employers in Perry County.

3. In or about early October 2007, Trinity Coal Marketing entered into a Coal Supply Agreement ("CSA") with the Defendant, pursuant to which Trinity Coal Marketing agreed to sell, and Defendant agreed to purchase, certain volumes of coal for the calendars years 2008 through 2013. The parties subsequently amended the CSA on or about January 1, 2010 (the "Amendment"). A true and correct copy of the CSA, as amended, is attached hereto as Exhibit 1.

4. Effective November 1, 2011, Trinity Coal Marketing assigned all of its rights and obligations under the CSA to Trinity Coal; Trinity Coal Marketing provided notice of the assignment to Defendant by letter dated September 29, 2011. A true and correct copy of the Notice of Assignment is attached hereto as Exhibit 2.

5. Specifically, pursuant to the CSA, Trinity agreed to supply, and Defendant agreed to purchase, a minimum total of 14,000,000 tons of coal from January 1, 2008 through December 31, 2013.

6. Defendant, however, has not lived up to its contractual obligations. As described below, beginning in late 2010, Defendant failed and refused to take delivery of significant tonnage obligations under the CSA, ultimately refusing to accept delivery of, and pay for, hundreds of thousands of tons of coal.

7. Furthermore, despite Trinity's prompt and proper notice to Defendant in January 2011 of governmental impositions affecting Trinity's production costs – which impositions entitled Trinity to a price adjustment under the CSA – Defendant first ignored, then stalled and delayed, Trinity's repeated efforts to obtain the adjustment to which Trinity was entitled.

8. Despite Defendant's numerous and repeated failures to take delivery of its tonnage obligations under the CSA, and Defendant's unjustified recalcitrance in negotiating a

price adjustment to which Trinity was entitled under the CSA, Trinity continued to supply coal to Defendant, at substantial additional costs to Trinity.  At no point did Trinity utilize Defendant's repeated failures to perform its obligations under the CSA as a trigger to terminate the CSA, although the CSA permitted Trinity to take such action.

9. In return for its continued patience and performance of its obligations under the CSA in the face of substantial additional production costs, on or about March 6, 2012, Trinity received from Defendant a letter purporting to terminate the CSA.  In its March 6, 2012 letter, Defendant alleged that its purported termination was due to Trinity's alleged failure to meet certain quality specifications under the CSA.

10. As set forth more fully below, however, Defendant's purported termination of the CSA was both substantively unjustified and procedurally deficient.

11. Since its wrongful termination of the CSA, Defendant has refused to take delivery of any of its tonnage obligations under the CSA.

12. Defendant's continuing breach of its obligations under the CSA has resulted and will continue to result in significant irreparable harm to Trinity.

13. In particular, at the time Defendant purportedly terminated the CSA, Trinity had and now has 150,000 tons of coal stockpiled and allocated for delivery to Defendant.  As of this filing, this coal inventory, which is susceptible to spontaneous combustion despite Trinity's best efforts to avoid such an event, represents a significant hazard to the health and safety of Trinity's remaining employees and the surrounding areas.

14. In addition, as a result of Defendant's refusal to take delivery of any of its tonnage obligations under the CSA, Trinity has been forced to idle its mining operations and layoff approximately 260 skilled personnel at the Mine, with additional significant layoffs likely to

follow. The Mine produces approximately 170,000 tons of coal for sale each month; 150,000 tons of which are allocated for delivery to Defendant under the CSA.

15. Moreover, Defendant's conduct does not affect the Mine alone; coal produced in Trinity's facilities in Breathitt, Knott, Magoffin, Floyd, and Pike Counties have been, and are, used to fulfill Trinity's responsibilities under the CSA, and all will be seriously and negatively affected by Defendant's wrongful conduct.

16. Should Defendant's wrongful conduct continue, Trinity may be forced into bankruptcy and may be destroyed as a viable entity.

17. Moreover, the impact of the wrongful acts of Defendant will be felt by all businesses and employees that provide goods and services to the mining operations.

18. The irreparable harm suffered by Trinity cannot be compensated through an award of money damages alone.

19. As a result of the immediate and irreparable harm being suffered by Trinity as a result of Defendant's ongoing breach of the CSA, Trinity seeks a preliminary injunction from this Court requiring Defendant to specifically perform its obligations under the CSA in their entirety pending the conclusion of this matter.

## II.  PARTIES

20. Plaintiff Trinity Coal Corporation is a Delaware corporation with its principal place of business located at Scott Depot, West Virginia. Trinity Coal Corporation is engaged in the business of producing coal from its mines located in, among other places, Perry, Breathitt, Knott, Magoffin, Floyd and Pike Counties in Kentucky.

21. Plaintiff Trinity Coal Marketing, LLC is a Delaware limited liability company with its principal place of business located in Scott Depot, West Virginia and its sole member is

Trinity Coal Corporation.  Trinity Coal Marketing, LLC is engaged in the business of, *inter alia*, selling coal produced by affiliated companies to companies located throughout the United States.

22. Defendant is a body corporate and politic owned by and operating under the laws of the State of South Carolina, with a principal place of business located at Moncks Corner Office, One Riverwood Drive, Moncks Corner, South Carolina.  Defendant is engaged the business of, *inter alia*, generating, transmitting, and distributing electricity as a public utility.

### III.   JURISDICTION AND VENUE

23. Jurisdiction in this Court is proper pursuant to the Federal Declaratory Judgment Act, 28 U.S.C. § 2201 *et seq.* and 28 U.S.C. § 1332(a)(2), in that Plaintiffs are both citizens of the State of Delaware, Defendant is a citizen of the State of South Carolina, and the sum in controversy exceeds $75,000.00, exclusive of interest and costs.

24. Defendant has subjected itself to and availed itself of the jurisdiction of this Court by virtue of, *inter alia*, entering into the CSA, performing its obligations under the CSA in and around Perry County, Kentucky, including but not limited to purchasing and taking delivery of and title to the coal under the CSA in Perry County, Kentucky, and engaging in communications with representatives of Trinity in this judicial district.

25. Venue in this jurisdiction is proper pursuant to 28 U.S.C. § 1391(a)(2), as a substantial part of the events or omissions giving rise to the claims asserted herein occurred in this district, and a substantial part of the property that is the subject of this action is situated in this district.

## IV.   FACTUAL BACKGROUND

A.   **The Execution and Relevant Terms of the CSA.**

26.   In late September and early October 2007, Trinity and Defendant entered into the CSA, whereby Trinity agreed to supply at least 14,000,000 tons of coal to Defendant during the calendar years 2008 through 2013.

27.   This coal is to be delivered to Defendant and loaded in railcars by Trinity at a shipping point near Hazard, Perry County, Kentucky, where Defendant takes title of the same.

28.   Section 3.1 of the CSA provides that the coal supplied by Trinity under the CSA shall conform with certain quality specifications, which specifications are set forth in Appendix C to the CSA.

29.   Section 3.2 of the CSA sets forth procedures for sampling and analyzing the coal supplied under the CSA for the purposes of determining whether such coal complied with the quality specifications set forth in Appendix C.

30.   Section 3.3 of the CSA provides for price adjustments to the coal supplied under the CSA and purchased by Defendant in the event that the coal supplied fails to meet the quality specifications set forth in Appendix C.

31.   Pursuant to Sections 3.4 and 3.6 of the CSA, Defendant had the right to suspend or reject coal shipments in certain circumstances where the quality of coal supplied fails to comply with quality specifications set forth in Appendix C.

32.   Section 3.5 governs Defendant's right to terminate the CSA on grounds that the coal supplied fails to comply with the quality specifications set forth in Appendix C:

> In addition to and not as a limitation upon other rights of Buyer, if during a sixty (60) consecutive Day period following notice to Seller of failure to comply with Appendix C, fifty (50%) percent of the coal shipped fails to comply with any of the guaranteed specifications (except for the specification for sulfur) set forth in

> Appendix C, Seller shall be in material breach of this entire Agreement and Buyer shall have the right to immediately terminate this Agreement . . . .

33. Section 6.3 of the CSA entitles Trinity to a price adjustment to the sale price of the coal to account for any "government imposition."

34. Article 12 of the CSA provides, in relevant part, that "[a]ny notice or communication required to be in writing shall be given by registered, certified, or first class mail, telecopy or email addressed to the respective parties at the addresses listed in Appendix E." Pursuant to Appendix E, as amended, any notices supplied under Article 12 by Defendant to Trinity were to be provided to its president.

35. Over the course of the CSA, Trinity has supplied Defendant with, and Defendant has accepted delivery of and paid for, approximately 603 unit trains carrying more than 7,000,000 tons of coal without a single suspension, rejection, or formal complaint from Defendant.

## B. **Trinity And Defendant's Regular Communications Regarding Coal Sampling And Corresponding Price Adjustments**

36. Beginning on or about January 1, 2008, Trinity supplied Defendant with coal pursuant to the CSA.

37. Pursuant to Sections 3.2 and 3.3 of the CSA, Defendant regularly submitted to Trinity spreadsheets reflecting the results of coal sampling and analysis performed by Defendant regarding the compliance of the coal supplied with the quality specifications enumerated in Appendix C.

38. As a matter of course, Defendant submitted such sampling and analysis spreadsheets to Trinity for the purposes of processing the quality-based price adjustments in accordance with the CSA.

39.     Trinity used these spreadsheets for the exclusive purpose of determining such price adjustments, if any, necessary pursuant to Section 3.3 of the CSA.

40.     Defendant never – not once – forwarded any such spreadsheets directly to any person in an executive position for Trinity; to the contrary, all regular communications regarding sampling and analysis undertaken by Defendant pursuant to Sections 3.2 and 3.3 occurred between Defendant and Trinity's sales and accounting department.

C.      **Trinity Provides Notice to Defendant Of Intent To Seek Price Adjustment Due to Government Imposition; Defendant Ignores, Then Obstructs, Trinity's Efforts To Negotiate Contract Adjustments Related to Government Imposition And Other Issues**

41.     Defendant failed to accept delivery of the tonnage it was required to accept under the CSA for the 2010 calendar year; specifically, at the conclusion of the 2010 calendar year, Defendant had failed to accept delivery of approximately 136,267 tons of coal it was contractually obligated to take.

42.     In early January 2011, Trinity and Defendant negotiated a resolution to Defendant's failure to accept delivery of the required 2010 tonnage.

43.     Shortly thereafter, and by letter dated January 26, 2011, Trinity provided notice to Defendant of its claim for a price adjustment for coal to be delivered on or after January 1, 2011 under Section 6.3 of the CSA (hereinafter, the "GI Claim"); Section 6.3 provides, in relevant part, that "[p]rice adjustments **shall** be made for changes in costs due to [Trinity's] compliance with Changes in Government Impositions . . . ." (emphasis added).

44.     In its January 26, 2011 notice of its GI Claim, Trinity advised Defendant that "ongoing actions of the Environmental Protection Agency . . . in connection with inhibiting coal mining and the issuance of mining-related permits have caused significant burdens and

materially increased costs to Trinity and its affiliates supplying the coal as set forth in the [CSA]."

45. In its January 26, 2011 notice, Trinity also advised Defendant that it "has reason to assert and provide notice of *Force Majeure* under Section 8.1 of the [CSA];" Trinity, however, advised Defendant that Trinity "prefers to work with [Defendant] towards a fair and reasonable price adjustment."

46. Trinity followed up on its January 26, 2011 notice to Defendant with a February 3, 2011 letter; the February 3, 2011 letter advised Defendant that, according to Trinity's internal analysis, its costs per ton of coal produced increased by $7.60 as a result of the actions of the Environmental Protection Agency.

47. In its February 3, 2011 letter, Trinity reiterated its interest in working with Defendant toward a fair price adjustment as a result of the GI Claim.

48. In the weeks and months following the February 3, 2011 letter, Trinity attempted to engage Defendant in negotiations for a fair price adjustment to resolve both the GI Claim – an adjustment to which Trinity was contractually entitled.

49. Throughout the first six months of 2011, however, Defendant wholly failed to respond to the GI Claim in any significant manner, and failed to negotiate in good faith with Trinity in any way.

50. At the same time Defendant was largely ignoring the GI Claim, it was likewise failing to take delivery of substantial volumes of coal that it was obligated to take under the CSA; indeed, by September 2011, Defendant was more than 400,000 tons behind on its tonnage obligations for the 2011 calendar year.

51. Beginning in the Fall of 2011, Defendant engaged in discussions with Trinity regarding both the GI Claim and Defendant's failures to take its tonnage obligations under the CSA; given that these discussions involved executive personnel for both parties, Trinity reasonably expected Defendant was participating in good faith.

52. As these discussions continued throughout the balance of 2011 and into 2012, Trinity came to believe that Defendant's involvement in the discussions was perfunctory at best, and that by its token participation Defendant merely stalled and delayed the price adjustment that Trinity was entitled to under Section 6.3 of the CSA.

53. By way of example, in December 2011, Defendant submitted to Trinity a proposed resolution to the GI Claim; this proposal actually represented a less favorable resolution to the GI Claim for Trinity than a proposal submitted by Defendant two months earlier.

54. At no point in time during these discussions did Defendant advise Trinity, either verbally or in writing, that Defendant had concerns with Trinity's ability to supply coal that met the quality specifications set forth in Appendix C of the CSA; to the contrary, Trinity and Defendant proceeded, as they had for years with respect to the supply of such coal, to adjust the prices of the coal supplied by Trinity based upon the results of sampling and analysis performed under Section 3.2 of the CSA.

**D.     Defendant Reneges On Verbal Agreement To Resolve GI Claim After The Market Price For Coal Drops Precipitously In Early 2012**

55. In early January 2012, representatives of Trinity and Defendant reached a verbal agreement to resolve the GI Claim and all outstanding issues. This agreement included relaxing quality specifications for BTUs and ash.

56. The negotiated resolution also involved a deletion of certain volumes from the CSA, adjustments to CSA volumes and pricing for the calendar years 2012 and 2013, and the addition of the calendar year 2014 as an additional contract year under the CSA.

57. Mike Wilder, a Director of Sales for Trinity, confirmed this verbal agreement in a January 16, 2012 email to Jeff Armfield, Defendant's vice president of Fuels Strategy & Supply. A true and correct copy of the January 16, 2012 email is attached hereto as Exhibit 3.

58. In the following days and weeks, Mr. Armfield backtracked on the verbal agreement confirmed in Mr. Wilder's January 16, 2012 email.

59. Defendant's unwillingness to abide by the parties' agreed-to resolution coincided with a precipitous drop in demand for and the market price of coal in early 2012.

60. On or about February 9, 2012, representatives of both Trinity and Defendant met to further discuss a resolution of these issues.

61. At no point during the February 9, 2012 meeting between Trinity and Defendant did a representative of Defendant indicate that Defendant was displeased in any way with Trinity's ability to supply coal under the CSA that met the quality specifications set forth in Appendix C.

62. Indeed, following the meeting, Defendant's CFO and Executive Vice President, Elaine G. Peterson emailed Trinity's representatives and indicated that she found the meeting "enlightening," and that Defendant was "discussing some options to offer" that would resolve the outstanding issues.

63. Representatives of Trinity and Defendant maintained contact throughout February 2012. At no point during this time did Defendant advise Trinity of concerns with Trinity's

ability to meet the quality specifications set forth in the CSA; in fact, the parties were in agreement concerning relaxing these specifications as aforesaid.

E.      **Defendant Purports To Terminate The CSA Without Proper Notice**

64.     Without any advance notice whatsoever, and in the midst of what Trinity had been led to believe were good-faith negotiations, solely due to economic conditions and not the quality of coal supplied for years by Trinity, by letter dated March 6, 2012, Defendant purported to terminate the CSA pursuant to Section 3.5. A true and correct copy of Defendant's wrongful termination letter is attached hereto as Exhibit 4.

65.     Defendant provided Trinity with no advance notice of its intent to terminate the contract, much less the advance notice required by Section 3.5.

66.     Defendant has refused to accept delivery of any coal it is obligated to take under the CSA since its March 6, 2012 letter.

67.     Defendant's purported termination, and its subsequent refusal to take delivery of any of the coal it is obligated to accept under the CSA, constitute a repudiation of, and material breaches of, the CSA.

F.      **Trinity Suffers Irreparable Harm As A Result Of Defendant's Material Breaches**

68.     As a result of Defendant's purported termination of the CSA, and its subsequent failure to take delivery of coal from Trinity since March 6, 2012, Plaintiffs have suffered, and continue to suffer, irreparable harm.

69.     In particular, Trinity currently has a stockpile of approximately 150,000 tons of coal at the Mine, which volume represents the coal Trinity produced to supply to Defendant pursuant to Trinity's obligations under the CSA.

70.     The 150,000-ton coal stockpile combined with the wet spring rains could result in a spontaneous combustion of the coal inventory, despite Trinity's very best efforts to avoid such

an event; this risk of combustion represents a substantial health and safety hazard to Trinity, its employees, and the residents and environs of Perry County, Kentucky, and would cause substantial degradation to the coal product.

71. Furthermore, Defendant's purported termination has had a catastrophic effect on Trinity's operations.

72. To date, Trinity has idled its mining operations, laid off 260 highly skilled mine workers as a result of Defendant's refusal to fulfill its contractual obligations, and with additional significant layoffs likely to follow.

73. In addition to direct employees of Trinity who are affected by Defendant's material breaches, approximately 1,000 other related jobs – such as jobs related to transportation of the coal produced under the CSA, maintenance of Trinity's equipment and facilities, and the supply of goods and services to Trinity – may be lost in an area where unemployment rates already approach 15 percent.

74. The Mine produces approximately 170,000 tons of coal for sale each month; of these, 150,000 tons – or more than 88 percent of the total monthly tonnage produced for sale – are earmarked for delivery to Defendant under the CSA.

75. Put simply, if Defendant is not required to fulfill its obligations under the CSA, Trinity may be driven to file bankruptcy and may indeed be destroyed.

## V. CAUSES OF ACTION

### COUNT I - INJUNCTIVE RELIEF

76. Plaintiffs incorporate by reference the preceding paragraphs as if set forth at length herein.

77. For the reasons set forth above, specific performance is necessary to require Defendant to perform its obligations under the CSA and take delivery of its coal requirements thereunder, in order to enable Trinity to operate the Mine at full capacity and retain its highly skilled workforce to conduct these mining operations.

78. Trinity has demonstrated a likelihood of success on the merits and a balancing of the equities hugely favors the issuance of a preliminary and permanent injunction against Defendant compelling specific performance of its obligations under the CSA.

79. Trinity has no adequate remedy at law, and money damages will be inadequate to compensate Trinity for the harm suffered as a result of Defendant's ongoing repudiation and material breaches and defaults of the CSA.

80. The entry of preliminary and permanent injunctive relief against Defendant compelling specific performance is in the public interest and will not result in greater harm to Defendant than the harm Trinity has and will continue to suffer absent this relief.

## COUNT II - BREACH OF CONTRACT

81. Trinity incorporates by reference the preceding paragraphs as if set forth at length herein.

82. Trinity has fulfilled all duties, obligations and conditions precedent with regard to enforcement of the CSA.

83. As set forth in detail above, Defendant has substantially and materially breached the terms of the CSA by unjustifiably and improperly purporting to terminate the CSA, by unjustifiably resisting and delaying the institution of price adjustments related to the GI Claim to which Trinity is entitled, and by failing and refusing to accept delivery of thousands of tons of coal prior to and during the period from March 6, 2012 to the present.

84. Despite demand, Defendant has failed and refused to remedy its material breaches of the CSA.

85. Trinity has and will continue to suffer substantial and irreparable harm and damages as a result of Defendant's breach of the CSA as set forth above.

### COUNT III - DECLARATORY RELIEF

86. Trinity incorporates by reference the preceding paragraphs as if set forth at length herein.

87. As set forth more fully above, an actual controversy exists between Trinity and Defendants regarding their respective rights and obligations under the CSA.

88. Specifically, an actual controversy exists between Trinity and Defendant regarding whether Defendant improperly and unjustifiably terminated the CSA, and whether Defendant should be required to fulfill its obligations under the CSA.

89. A declaration from this Court determining the parties' respective rights and obligations under the CSA will serve a useful purpose in clarifying and settling the disputes between the parties, and will terminate and afford relief from the insecurity and controversy giving rise to this proceeding.

### VI.   REQUESTED RELIEF

**WHEREFORE**, Plaintiffs Trinity Coal Corporation and Trinity Coal Marketing, LLC prays as follows:

1. That the Court enter an Order granting Trinity's motion for injunctive relief, and requiring Defendant to specifically perform its obligations under the CSA in their entirety pending the conclusion of this matter by accepting delivery of paying for all coal tonnages,

including the full amount of the GI Claim, for which Defendant failed to accept delivery under the CSA; and

2. That Judgment be entered in Trinity's favor and against Defendant declaring Defendant to be in material breach of the CSA, and awarding Trinity damages as a result thereof and awarding Trinity its costs and expenses incurred herein.

3. For all other appropriate relief to which Trinity may be entitled.

BAIRD & BAIRD, P.S.C.

By: */s/ Charles J. Baird*
    Charles J. Baird
    David L. Baird

162 Second Street
Pikeville, Kentucky 41502
Phone: (606) 437-6276
Facsimile: (606) 437-6383

*Attorneys for Plaintiffs Trinity Coal*
*Corporation and Trinity Coal Marketing, LLC*